COURT OF CHANCERY
OF THE
STATE OF DELAWARE

SELENA E. MOLINA
SENIOR MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report: January 3, 2025
Date Submitted: September 11, 2024

Alicia A. Porter, Esquire
Benton & Shockley Law, P.A.
306 South State Street
Dover, Delaware 19904

Peter K. Schaeffer, Jr., Esquire
Avenue Law
1073 South Governors Avenue
Dover, Delaware 19904

Re: *Pleasant Hill Homeowners Association, Inc. v. Valerie Quillen, and James R. Munsey III*, C.A. No. 2023-1091-SEM

Dear Counsel,

Through this action, a homeowners association seeks to enforce deed restrictions against homeowners. For the reasons I will explain, I find in favor of the association and recommend that injunctive relief be issued to remedy the homeowners' noncompliance with the applicable restrictions. I further recommend the petitioner be awarded the court costs it incurred in this matter. This is my final post-trial report.

## I.    BACKGROUND[1]

This action was brought by Pleasant Hill Homeowners Association, Inc. (the "Petitioner"), against Dr. Valerie Quillen and James R. Munsey, III (the "Respondents" and, together with the Petitioner, the "Parties"). The Petitioner seeks a mandatory injunction to remove or bring into compliance a fence on real property located at 177 Exchange Drive, in Camden-Wyoming, Delaware, within the Pleasant Hill common interest residential community ("Pleasant Hill"). Per the Petitioner, the fence violates a deed restriction, more fully described below, which binds the property at issue (the "Restriction"). I begin with some background on the community, before turning to the Restriction, the Parties, and the dispute before me.

### A.    Pleasant Hill

Pleasant Hill is a community of 90 homes.[2] Through its board, the Petitioner is tasked with, among other things, "the enforcement of the covenants, conditions and restrictions of [Pleasant Hill.]"[3] Pleasant Hill's board consists of three total

---

[1] The facts in this report reflect my findings based on the record developed at trial on September 11, 2024, as well as those agreed upon by the parties in the joint pretrial stipulation. *See* Docket Item ("D.I.") 43 ("Pretrial Order"), 48 (trial transcript). Citations to the trial transcript are in the form "[Last name] Tr." referring to the testimony, statement, or objection of the identified person. The Petitioner's exhibits are cited as "PX__," and the Respondents' exhibits are cited as "RX__." I grant the evidence the weight and credibility I find it deserves.

[2] Rogers Tr. 14:22–23.

[3] PXD at 18.

members. Those members, both now and at the relevant time, are Dr. Larry Ward, Alicia Porter, Esq., and Veronica Rogers.[4] Ms. Rogers is the board's president, Ms. Porter is its vice president, treasurer, and attorney, and Dr. Ward is its secretary.[5] Ms. Rogers moved into Pleasant Hill in 2011[6] and, at the time of trial, had been a member of the board for the past three years.[7] Ms. Porter has been on the board even longer than Ms. Rogers,[8] whereas Dr. Ward moved to Pleasant Hill in 2021[9] and served on the board for nearly two years by the time of trial.[10] Respondent Dr. Quillen was also a member of the Petitioner's board briefly in 2014.[11]

During the relevant time, the Petitioner arranged for HPS to be Pleasant Hill's community management company.[12] As management company, HPS was tasked

---

[4] Rogers Tr. 33:10–14.

[5] *See id.* at 35:1–2; RXB at 2.

[6] Rogers Tr. 31:2–3.

[7] *Id.* at 82:12–19, 154:19–24.

[8] *Id.* at 33:15–21.

[9] Ward Tr. 140:9–11. I note that the Respondents objected at trial to Dr. Ward's testimony because the Petitioner did not identify him as a witness in the Pretrial Order. Schaeffer Tr. 139:10–14. I preserved the objection but allowed Dr. Ward to testify. Court Tr. 139:22–24. The Respondents did not pursue the objection post-trial, and thus the issue has been waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[10] *See* Ward Tr. 143:1–4.

[11] Quillen Tr. 92:10–12.

[12] Rogers Tr. 14:24–15:18.

with riding through Pleasant Hill monthly, reporting violations to the board for approval of violations and fines, and sending out violation notification letters.[13] In addition to HPS notifications, violations were also reported directly to board members.[14]

### B. The Restriction

Properties within Pleasant Hill are governed by the Declaration of Covenants, Conditions and Restrictions for Pleasant Hill Farms (the "Declaration"), updated as of July 24, 2006, which is recorded in the Office of the Recorder of Deeds in and for Kent County.[15] This action requires my review of three sections in the Declaration: Article IV, Section 5 (the Restriction); Article V, Section 6; and Article V, Section 7. I will briefly address each in turn.

---

[13] *Id.* at 15:19–16:2. Although HPS was technically supposed to conduct monthly ride-throughs, they typically did so every six to eight weeks. *Id.* at 16:3–10.

[14] *Id.* at 16:20–17:5.

[15] Pretrial Order at II(1); D.I. 1 ("Compl."), Ex. A. A fence height resolution (the "Resolution") pertaining to the Restriction was purportedly adopted at a board meeting on January 25, 2024. *See* RXB at 2. The Resolution lists both an adoption and effective date of January 5, 2024, and was attested to by Dr. Ward in his capacity as the board's secretary on March 25, 2024. *Id.* The board met telephonically and agreed on the Resolution on January 5, 2024. Rogers Tr. 29:1–4, 29:12–13. The March 25, 2024 date apparently indicates the point in time in which the Resolution language actually came together. *Id.* at 29:21–30:1. The Resolution purports to "clarify the [Restriction]" and explains, among other things, that "the height restriction for fences is exclusive of a topper." RXB at 1. I do not consider the Resolution dispositive to my analysis of the Restriction, which, as explained below, I address through contract principles.

The Restriction provides:

No fence, wall, hedge, or mass planting shall be erected or permitted except to the rear of the main house structure and such fence, wall, hedge, or mass planting shall not be permitted to be over four feet in height; EXPRESSLY EXCEPTION [sic] HOWEVER, there may be erected at the perimeter boundary line of Pleasant Hill Farms Development (either by Declarant or individual property owners) a perimeter boundary fence to the maximum height allowed by the applicable zoning authority at any given time (the purpose of such fence being to provide privacy and security for the development and/or individual lots from public roads and other lands adjoining the Pleasant Hill Farms Development).

Article V, Section 6 constitutes a non-waiver clause, providing:

Non-waiver. Failure of the Declarant or any Owner or their respective legal representatives, heirs, successors and assigns, to enforce any [r]estrictions contained in this Declaration shall in no event be considered a waiver of the right to do so thereafter, as to the same violation or breach or as to such violation or breach occurring prior or subsequent thereto.

Finally, Article V, Section 7 states:

Construction and Interpretation. The Association, to the extent provided herein, may adopt and promulgate reasonable rules and regulations regarding the administration, and interpretation and the enforcement of the provisions of this Declaration. In so adopting and promulgating such rules and regulations and in making any finding, determination, ruling or order or in carrying out any directive contained herein relating to the issuance of permits, authorizations, approvals, rules or regulations, the Association shall take into consideration the best interest of the Owners to the end that Property shall be preserved and maintained as a viable community.[16]

---

[16] PXD at 21–22, 24.

## C.    The Fences

This action revolves around the fence the Respondents constructed in late 2023. But, in defending their conduct, the Respondents have highlighted several other fences in Pleasant Hill. I address these in turn.

The record is sparse regarding the Respondents' decision to build a fence and their thinking behind the height therefor. What is undisputed is that the Respondents did not ask for the board's permission before purchasing or moving forward with construction of their fence. Rather, Dr. Quillen felt she did not need to.[17] Despite not seeking board approval to install the fence, per her own recollection, Dr. Quillen spoke to multiple other homeowners to ask "if they filed an application, received push back from [the association] or received any violation letters or fines/fees."[18] Dr. Quillen recalled that "[a]ll of them stated 'no.'"[19]

Ultimately, the Respondents moved forward with their fence without seeking approval from the Petitioner. They worked with Forrest Fencing. On or around

---

[17] *See* Quillen Tr. 117:22–23. Despite this, in July 2023, the former board president spoke with Ms. Porter about what Dr. Quillen "had to send in" when making other aesthetic and structural changes to her home. PXC at 12–14; Rogers Tr. 24:10–15. Though Ms. Rogers's testimony suggests that Dr. Quillen submitted an "application" in relation to those alterations, this is unsupported by the record.

[18] PXF. Although the Respondents objected to PXF on the basis of relevance, this objection is overruled. *See infra* note 39.

[19] PXF.

September 11, 2023, sales representative Cody Davis prepared a contract and invoice for the Respondents for the installation of a six-foot fence.[20] Thereafter, in or around October 2023, the Respondents had their five-feet-tall fence with a one-foot topper installed (the "Fence").[21]

But the Fence is not the only one in the community falling out of compliance.[22] There are other fences in Pleasant Hill, some of which are four feet tall with a one-foot topper, bringing the total height to five feet, and at least one is indisputably presumed to be at least six feet tall in total, plainly violating the Restriction.[23] As to the four-foot fences with one-foot toppers, the board has not taken any action because it elected to define the term "fence" in the Restriction "as a four foot [fence] with a 12-inch topper to be more inclusive of the neighbors, who may have had older fences . . . . to be inclusive of everybody and . . . grandfather[]

---

[20] PXA at 1–2; Davis Tr. 6:24–7:1, 7:23–8:10. Although Forrest Fencing handles obtaining permits with the applicable county for fence installations, the customer is in charge of handling any homeowners association approvals. *Id.* at 10:6–12. I pay no mind to the fact that the Respondents did not execute the "Agreement of [N]o Liability or Fault" waiver dated November 30, 2023 from Forrest Fencing. PXA at 8.

[21] *See* Davis Tr. 8:9–10; Quillen Tr. 118:6–13.

[22] The Respondents presented evidence regarding other unapproved and non-compliant structures and alterations within Pleasant Hill. *See, e.g.*, DXA at 18 (photograph of trees). I find this evidence largely irrelevant and consider only fence height violations for purposes of rendering this decision.

[23] Rogers Tr. 30:7–31:11.

[them in to compliance.]"[24] The presumed six-foot fence has been present for many years, since at least 2011, and may be the only fence greater than five feet in total.[25] This year, another Pleasant Hill homeowner submitted an application to the board seeking a six-foot fence, which was repeatedly denied for being "too high."[26]

### D. Procedural Posture

The Petitioner initiated this action on October 27, 2023, through a petition seeking a declaratory judgment and injunctive relief.[27] I ordered expedited mandatory mediation under Title 10, Section 348 of the Delaware Code, on November 16, 2023.[28] The Respondents' counsel informed me at a teleconference on January 12, 2024 that mediation occurred and a stipulation would be filed, which I received and granted on January 26, 2024.[29] The stipulation was for a stay to allow the Parties to explore "Alternate Relief."[30] Thus, I vacated the remaining schedule

---

[24] *Id.* at 26:9–27:7.

[25] *See id.* at 30:12–31:6.

[26] *Id.* at 25:6–19.

[27] Compl.

[28] D. I. 3–5.

[29] D.I. 11–14.

[30] D.I. 13.

and removed the April 2024 pretrial conference and trial dates from the Court's calendar.[31]

Then on April 15, 2024, the Respondents requested a teleconference to discuss what they alleged to be the Petitioner's non-compliance with the Parties' settlement agreement apparently reached at mediation.[32] The next day, the Respondents noticed the deposition of both Ms. Porter (who is also the Petitioner's counsel in this action), and of HPS's record keeper.[33] Following some back and forth briefing on a motion to quash and for a protective order,[34] the stay was lifted and this matter geared toward litigation.

On June 26, 2024, I granted a new case schedule setting trial for September 11, 2024.[35] The attempted deposition of Ms. Porter then reared itself again before becoming a subpoena *ad testificandum*, leading to another motion to quash and a motion for continuance.[36] I directed the parties to meet and confer in hopes that they

---

[31] D.I. 14.

[32] D.I. 15.

[33] D.I. 16, 19.

[34] D.I. 20–21.

[35] D.I. 27.

[36] D.I. 28–29, 32–35.

could resolve the issue without me,[37] but unfortunately my judicial intervention was needed. I granted the motion to quash, mooting the request for a continuance.[38]

Trial was ultimately held on September 11, 2024, at which point I took the matter under advisement.[39]

## II.   ANALYSIS

The Petitioner seeks an injunction which would require the Respondents to either take down the Fence or bring it into compliance, and court costs.[40] As further

---

[37] D.I. 36.

[38] D.I. 39–41.

[39] D.I. 45. After trial, the Petitioner responded to objections made against several exhibits it introduced at trial. D.I. 46–47. Specifically, the Respondents objected to the Petitioner's trial exhibits F, G, H, and I. Although the Respondents represented by letter that they objected to the exhibits "on the basis of unfair prejudice as [the Petitioner] did not disclose same upon [the Respondent's] discovery request[,]" D.I. 46, Exhibit F was actually objected to on the basis of relevance insofar as Mr. Schaeffer was "just reserv[ing] the right to redirect [the witness] on it[.]" Schaeffer Tr. 116:22–117:12. Putting this all aside, what Dr. Quillen did or did not know almost ten years ago when she sat on the board is not important to me. But even so, Dr. Quillen testified that "there were fence violations then." Quillen Tr. 92:10–14. Instead, because I find that both she and Mr. Munsey were, at bottom, on record notice of the Declaration and Restriction therein, their actual knowledge bears no importance. Indeed, Dr. Quillen's own "violation material" contained a note that "[p]rior to installing [her] fence, [she] spoke to . . . homeowners . . . [about] if they filed an application, received push back from HOA or received any violation letters or fines/fees." PXF. Those alleged homeowners did not testify, and I do not have enough information to determine the note's veracity. Nevertheless, I find these objections go to weight rather than admissibility and they are, as such, overruled; I give these exhibits the weight and credibility I find they deserve.

[40] The Petitioner does not have any attorneys' fees because Ms. Porter did not charge any, and the "action was brought . . . to be able to afford both the [Petitioner] the opportunity to be able to pursue the charges without the fees, but also for the [Respondents] to not have to pay attorneys' fees should the [Petitioner] prevail." Porter Tr. 172:18–23.

explained herein, I find injunctive relief warranted because the Restriction is enforceable, was breached, and the equities weigh in favor of the Petitioner. I also find that court costs should be shifted in the Petitioner's favor.[41]

## A. Injunctive relief should be awarded.

The Petitioner seeks injunctive relief, requiring the Respondents to either remove the fence or bring it into compliance with Pleasant Hill's restrictions.[42] To

---

[41] In so holding, I reject the Respondents' competing request for fee shifting under Title 10, Section 348 of the Delaware Code; the Respondents are not the prevailing parties. The Petitioner further waived any request for Section 348 fee shifting by failing to include such request in the pretrial stipulation, wherein the Petitioner conditionally sought fee shifting only "[i]f the case is continued and co-counsel is sought . . . ." D.I. 43. *See also Emerald P'rs v. Berlin*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

[42] I note that in the complaint, the relief sought by the Petitioner differed from what was listed in the Pretrial Order. *Compare* Compl. at 6 (seeking "a declaratory judgment in favor of the Association and against [the Respondents] which declares the Six-Foot Fence prohibited by the Declaration; . . . a permanent injunction to enjoin [the Respondents] from maintaining the Six-Foot Fence on the home; . . . an order that the [Respondents] remove the Six-Foot Fence and if the [Respondents] fail to do so, granting the Association permission the power of self-help [sic] to cause the removal of the Six-Foot Fence at [the Respondents'] cost; . . . an award of legal damages to the Association in an amount to be determined at trial for any and all economic injuries sustained by the Association; an award of attorneys' fees and court costs to the Association; and . . . any other relief this Court deems equitable and just"), *with* Pretrial Order at 4–5 (seeking "[the Respondents] to enjoined [sic] to lower the height of their fence to be in compliance with the Declaration and the [R]esolution[;] . . . [the Respondents] to reimburse [the Petitioner] for all associated court costs[;] . . . [and] [i]f the case is continued and co-counsel is sought by [the Petitioner], [the Petitioner] will be seeking any related attorneys' fees"). Because the Pretrial Order offers the Respondents the ability to bring the Fence into compliance, I, too, offer them that option.

I appreciate that the direction to "bring the Fence into compliance" is less than precise, particularly given the Resolution and the uncertainty it brings with it. Unfortunately, the enforceability of the Resolution is not an issue pending before me and I decline to stray outside the appropriate bounds of this action to address it. If the

obtain that relief, the Petitioner must prove, by a preponderance of the evidence: "(1) actual success on the merits of the claims; (2) that the [Petitioner] will suffer irreparable harm if injunctive relief is not granted; and (3) that the harm to the [Petitioner] outweighs the harm to the [Respondents] if an injunction is granted."[43] I find that the Petitioner met its burden, and thus injunctive relief should be awarded.

### 1. The Petitioner has demonstrated actual success on the merits.

To demonstrate actual success, the Petitioner needed to establish that the Restriction is enforceable and was breached by the Respondents. It met this burden, and I reject the Respondents' argument that the Petitioner's enforcement right has been waived.

The Petitioner contends the Respondents violated the Restriction. Although the Respondents point me to a string of cases pertaining to architectural review

---

Respondents opt for compliance, I encourage the Parties to meet and confer before remediation efforts begin to ensure a mutually acceptable resolution.

[43] *Benner v. Council of Narrows Ass'n of Owners*, 2014 WL 7269740, at *11 (Del. Ch. Dec. 22, 2014) (citing *Examen, Inc. v. VantagePoint Venture P'rs 1996*, 2005 WL 1653959, at *2 (Del. Ch. July 7, 2005)); *see also Civic Ass'n of Surrey Park v. Riegel*, 2022 WL 1597452, at *9 (Del. Ch. May 19, 2022) ("The burden of proof . . . is by a preponderance of the evidence. Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not.") (citation and quotation marks omitted).

covenants, I do not deem the Restriction to be an architectural review covenant.[44]

Instead, as a basic deed restriction, its interpretation is simply "a matter of contract interpretation" under Delaware contract law.[45]

---

[44] In the Complaint the Petitioner alleges that, under Article V, Section 7, through which the homeowners association "may adopt and promulgate reasonable rules and regulations regarding the administration, and interpretation and the enforcement of the provisions of the Declaration[,]" the association "adopted and implemented the Application for Exterior Alteration . . . for owners to submit and obtain approval prior to commencing exterior alterations." Compl. at 3. The board appears to be of the belief that it can *require* residents to submit a form to obtain approval before commencing exterior alterations. *See, e.g.*, Rogers Tr. 46:16–20 (Q: "Does the [D]eclaration say . . . homeowners have to apply for preapproval before doing anything with their residence?" A: "[Y]es, they do. They do have to apply through the portal."); Pretrial Order at 1 ("In addition, [the Respondents] failed to request permission to erect the fence[.]"). I disagree. Instead, as I understand it, homeowners are submitting their plans for alterations to the association to ensure they are in compliance with the Declaration, and the use of the form is the board's way of administering and enforcing those provisions. *See* Porter Tr. 160:17–21 ("[T]he purpose of having that application is to put everyone on notice that this board is going to enforce the rules. And so if you have a question as to whether or not you are going to be in violation of the rules, you are to ask permission."). Thus, I find the Application for Exterior Alteration does not transform the Restriction into an architectural review covenant.

Even if it did, the Restriction "present[ed] clear, precise, and fixed standards of application" and was not arbitrarily applied. *See Lawhon v. Winding Ridge Homeowners Ass'n, Inc.*, 2008 WL 5459246, at *5 (Del. Ch. Dec. 31, 2008). This distinguishes the matter at hand from cases like *Seabreak Homeowners' Ass'n, Inc. v. Gresser*, 517 A.2d 263, 265 (Del. Ch. 1986), wherein the time of plan submission under an architectural review covenant "marked the first occasion that the [architectural review committee] had formally adopted [the] restriction and had given notice to anyone, including the [defendants,] that such a restriction had been adopted."

I am also not swayed by any potential argument pertaining to the Resolution and its propriety. Even if I were to consider the Resolution, as in *Welshire Civic Association Inc. v. Stiles*, 1993 WL 488244 (Del. Ch. Nov. 19, 1993), the board appears to have interpreted the Restriction uniformly across the board, giving grace most openly to one home greater than five feet total in height at 104 Kingston which has had its fence up for many years. Rogers Tr. 30:7–31:6. Although Dr. Quillen directs me to other fences which purportedly exceed the bounds set forth under the Resolution, *see, e.g.*, RXA at 11, the board was only

### a.  The Restriction is enforceable.

The Restriction is clear and unambiguous. It provides in relevant part: "No fence . . . shall be erected or permitted except to the rear of the main house structure and such fence . . . shall not be permitted to be over four feet in height" within Pleasant Hill. This provision provides notice to all those within the community as to what is permitted (a four-foot or shorter fence on the rear of the main house on each property), is enforceable as written, and requires no further interpretation.

### b.  The Respondents violated the Restriction, and their waiver argument should fail.

The Respondents do not dispute that they violated the Restriction by installing a fence that is greater than four feet in height. But the Respondents argue that the Petitioner waived its ability to enforce the Restriction. I disagree. I further find the Petitioner's attempt to enforce the Restriction against the Respondents is not arbitrary or capricious. Thus, I find no bar to the Petitioner's ability to enforce the Restriction in this action.

---

aware of one fence over five feet total. Rogers Tr. 31:4–6.  I also decline to give much weight to RXA, Dr. Quillen's submission of photos and descriptions of alleged Declaration violations, the bulk of which I find largely unconvincing. *See* Rogers Tr. 155:15–156:7 (disproving Dr. Quillen's allegation that a fence (identified in RXA at 23), was six feet tall).

[45] *Wild Quail Golf & Country Club Homeowners' Ass'n, Inc. v. Babbitt*, 2021 WL 2324660, at *3 (Del. Ch. June 3, 2021), *adopted*, (Del. Ch. June 17, 2021).

I begin with waiver. To prove waiver, the Respondents would need to show that the association had not enforced the Restriction "to such an extent that it would be unfair for it to enforce the [Restriction] against [them.]"[46] This burden is even greater when the covenants which bind the community contain a non-waiver provision, a provision this Court recognizes as a contractual right. Such provisions require the challenger to "demonstrate, by a preponderance of the evidence, that the presence of [violations] is pervasive . . . and [the association's] allowance of [these violations] reflects a total and absolute abandonment of [the association's] right" to enforcement.[47]

Here, the Respondents have not articulated any basis on which to overcome the Declaration's non-waiver provision. This Court has enforced similar non-waiver provisions in the past,[48] and the Respondents have not given me reason to depart from this precedent. Furthermore, the Respondents failed to present evidence showing that "more likely that not" the Petitioner knowingly waived its enforcement rights. Rather, the board applied the Restriction based on its interpretation of the term "fence." Additionally, the board denied a six-foot fence application brought

---

[46] *Quail Vill. Homeowners Ass'n, Inc. v. Rossell*, 2018 WL 6534456, at *10 (Del. Ch. Dec. 10, 2018).

[47] *E.g.*, *Surrey Park*, 2022 WL 1597452, at *11.

[48] *See, e.g.*, *Brandywine Hills Cmty. Ass'n v. T. Bruce Wilmoth Constr. Co.*, 1995 WL 767336, at *9 (Del. Ch. Dec. 21, 1995).

before it in 2024 multiple times, and ultimately approved a four-foot fence with a one-foot topper for those same applicants.[49] Even if the Respondents could find a way around the non-waiver language of the Declaration, they fall short of meeting their burden to prove waiver or to establish that the Petitioner's enforcement efforts in this action should be rejected as arbitrary and capricious.[50]

---

[49] Rogers Tr. 25:6–26:4. This to me indicates consistency in enforcement of the Restriction, cutting against the Respondents' allegation of arbitrary and capricious enforcement. *Cf. Welshire*, 1993 WL 488244.

[50] *See Quail Vill.*, 2018 WL 6534456, at *10 ("A waiver of deed restrictions usually involves a failure to object to other violations of the same or similar restriction such that it would be unfair to allow the claimant to enforce the [restriction] against the current violation. . . . [The Respondents] bear[] the burden of proof on [their] affirmative defense of waiver[.]") (citation and quotation marks omitted). As I explained, I find that the permitted twelve-inch topper on a four-foot fence is the board's uniform interpretation of the Restriction. Whether or not that interpretation is correct is not the issue at hand.

I also direct the parties to *Civic Association of Surrey Park v. Riegel*, 2022 WL 1597452 (Del. Ch. May 19, 2022). As in *Surrey Park*, I decline to find these circumstances "so pervasive or systemic that it is more like than not [the board] has totally and absolutely abandoned" its enforcement rights. 2022 WL 1597452, at *11. For similar reasons, I find the Respondents' argument that the settlement in *Pleasant Hill Homeowners Association, Inc. v. Massuli*, C.A. No. 2021-0407-PWG shows arbitrary and capricious enforcement of deed restrictions by the Petitioner to be meritless, particularly because the circumvention of the restrictions at issue there may have come "only after repeated attempts out of court to try and settle it." Quillen Tr. 121:4–5; *cf. Brandywine Hills*, 1995 WL 767336, at *10 (explaining that "prior failure to enforce in good faith does not preclude future enforcement of the same restrictive covenant").

### 2. The Petitioner will suffer irreparable harm absent injunctive relief, and balancing the harms favors the Petitioner.

The second element in a request for a permanent injunction is that the moving party will suffer irreparable harm absent relief. In deed restriction cases, irreparable harm is essentially presumed. As then-Vice Chancellor Steele explained:

> The [homeowners within a community with deed restrictions] knowingly enter into a social contract with the other lot owners when purchasing their land. This contract includes adhering to the [r]estrictions' restrictive covenants. . . . Once a restriction is breached, the [homeowners association] can never again regain the sanctity of the covenant.[51]

Thus, I find the irreparable harm element easily established, and no evidence has been presented to me suggesting anything to the contrary.

The third element requires me to balance the harms against the parties. Although injunctive relief may be jarring, and even extreme at times, it is appropriate to address a deed restriction breach when, as here, there would not be "substantial economic harm" to the noncompliant homeowners.[52] This is because "[e]quity will not reward a knowing breach of restrictions."[53] I find Vice Chancellor Noble's

---

[51] *Slaughter v. Rotan*, 1994 WL 514873, at *3 (Del. Ch. Sept. 14, 1994).

[52] *Cove on Herring Creek Homeowners' Ass'n, Inc. v. Riggs*, 2003 WL 1903472, at *6 (Del. Ch. Apr. 9, 2003).

[53] *Quail Vill.*, 2018 WL 6534456, at *3; *Plantation Park Ass'n, Inc. v. George*, 2007 WL 316391, at *3 (Del. Ch. Jan. 25, 2007) (explaining this Court may "discount harm resulting for the knowing breach of the covenant" in its balancing analysis).

decision in *Cove on Herring Creek Homeowners' Association, Inc. v. Riggs* instructive on this point. Therein, Vice Chancellor Noble ordered injunctive relief, mandating the removal of unapproved sheds. Because the homeowners failed to make any showing of "substantial economic harm if they [we]re required to remove their sheds[,]" the Vice Chancellor granted injunctive relief.

I recommend the same here. The Respondents, despite notice of the Declaration, which includes the Restriction, knowingly violated the unequivocal bar on fences greater than four feet tall. The harm to the Petitioner is evident from the breached social contract. The Respondents, on the other hand, have failed to demonstrate that if injunctive relief were to be granted there would be any substantial economic harm to them that would outweigh the harm they caused.[54] Accordingly, injunctive relief should be issued directing the Respondents to either remove the Fence or bring it into compliance with the Restriction.

---

[54] In total, the Fence invoice reflects a cost of $16,000.00. PXA at 2. A proposal that Mr. Davis gave Dr. Quillen on November 27, 2023, indicates that it would cost $5,500.00 to cut the Fence down to four feet, with the caveat that estimates are only "[g]ood for 7 days." PXA at 3–4. Per email correspondence between Mr. Davis and Dr. Quillen, to remove the fence entirely would cost $1,500.00, PXA at 6, though presumably that estimate was also only good for 7 days once made. Nonetheless, these costs are largely of the Respondents' own making. *Cf. Tusi v. Mruz*, 2002 WL 31499312, at *5 (Oct. 31, 2002) (acknowledging the "draconian nature of relief requiring demolition of [a] [g]arage" and, nonetheless, ordering same); *Christine Manor Civic Ass'n v. Gullo*, 2007 WL 3301024, at *3, *4 (Del. Ch. Nov. 2, 2007) (finding "[t]he only equitable and viable remedy available to the Court" where the homeowner built a structure without approval and "at her risk" was "removal of the structure").

**B.      The Petitioner is entitled to court costs.**

Having found in favor of the Petitioner, I turn to the Petitioner's final request for relief—costs.[55] As the prevailing party, the Petitioner is entitled to costs under Court of Chancery Rule 54(d); I find no basis to direct otherwise.

## III.    CONCLUSION

For the reasons stated herein, I find in favor of the Petitioner. This Court should issue a permanent injunction requiring the Respondents to either remove the Fence or bring it into compliance with the Restriction. The Respondents should also bear the Petitioner's court costs incurred in this action.

This is my final report, and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Senior Magistrate in Chancery

---

[55] The Petitioner initially sought to recoup its attorneys' fees in addition to court costs, *see* Compl. ¶ 25, but ultimately abandoned that request because it did not incur any fees. *See* RXD.